480 So.2d 184 (1985)
Ali A. AZIMA, Petitioner,
v.
STATE of Florida, Respondent.
No. 85-1471.
District Court of Appeal of Florida, Second District.
December 18, 1985.
*185 Bernard H. Dempsey, Jr. and Richard Lee Barrett of Dempsey & Goldsmith, P.A., Orlando, for petitioner.
Jim Smith, Atty. Gen., Tallahassee, and Ann Garrison Paschall, Asst. Atty. Gen., Tampa, for respondent.
RYDER, Chief Judge.
Ali Azima was convicted for the misdemeanor of culpable negligence. The circuit court for Lee County affirmed the conviction. Azima now petitions this court to issue a writ of certiorari to the circuit court and to quash the affirmance of his conviction. We grant the petition and issue the writ.
Ali Azima is a medical doctor in the field of obstetrics and gynecology. On December 1, 1977, Azima performed an abortion on Holli Schmidt. The next day he inserted an IUD into Schmidt.
On June 11, 1979, Schmidt visited Azima's clinic because she was nine days late on her menstrual period and was exhibiting all of the overt signs of pregnancy. Azima found that Schmidt was not pregnant, and he did not administer any treatment.
On February 23, 1981, Schmidt again visited Azima's clinic because she was two weeks late on her menstrual period and was exhibiting the same pregnancy symptoms as she had on her June 1979 visit. Azima performed a two-minute urine pregnancy test, which according to the testimony of several experts, is from 85% to 99% accurate. The urine test result was negative. Azima then conducted a pelvic exam, which also showed that Schmidt was not pregnant. Because of the negative pregnancy test, the negative pelvic exam, and his knowledge of Schmidt's past history of irregular menstrual periods, Azima told Schmidt she was not pregnant. Schmidt then requested that Azima insert an IUD in her. Azima explained to Schmidt the dangers and ramifications inherent in the insertion of the IUD, then inserted one within her.
Schmidt returned to Azima's clinic again on March 5, 1981 and told him that she was still experiencing various symptoms of pregnancy. Azima performed another two-minute urine pregnancy test and pelvic exam. Both were negative. Azima scheduled another appointment for Schmidt a few weeks later. Schmidt failed to keep the appointment and, instead, went to another doctor on April 27, 1981. That physician, on the basis of a pelvic exam, determined that she was pregnant. A few days later, Schmidt underwent an abortion. She did not suffer any physical damage to her body as a result of the insertion of the IUD inside of her while she was pregnant.
Later, the state charged Azima with the misdemeanor of culpable negligence under section 784.05(1), Florida Statutes (1979):
Whoever, through culpable negligence, exposes another person to personal injury shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
A jury trial ensued. During the trial, four medical doctors testified as expert witnesses for the prosecution. Their testimony was substantially the same, that being that they would not have inserted an IUD into a patient who was exhibiting pregnancy *186 symptoms. Each doctor stated that it was dangerous to insert an IUD into a pregnant woman because it exposed the woman to dangers which could possibly cause great bodily harm and potentially threaten her life.
One doctor testified that in 1981, two types of urine pregnancy tests were available for use. One was a two-minute test which had an 85% accuracy rate. The other was a two-hour test which had a 95%-plus accuracy rate. At that time, there were also two blood pregnancy tests available for use. One had a 95% accuracy rate, the other a 99% accuracy rate. If a patient had pregnancy symptoms but the urine test was negative, he would then use the 99% accuracy blood test on the patient. The three other doctors testified that they would not insert an IUD into a patient with pregnancy symptoms, even if the urine pregnancy test was negative.
At trial, Schmidt testified that she did not think Azima would have implanted an IUD in her if he thought she were pregnant, and she did not think that he was trying to deceive her.
The jury found Azima guilty as charged. The circuit court affirmed the conviction. In his petition to this court, Azima argues that the circuit court affirmance was a departure from the essential requirements of the law because the conviction of culpable negligence is unsupported by evidence presented at trial. We agree.
Under section 784.05(1), the state had to prove that Azima, through culpable negligence, exposed Schmidt to personal injury. The Florida Supreme Court has defined culpable negligence as "the omission to do something which a reasonable, prudent and cautious man would do, or the doing of something which such a man would not do under the circumstances surrounding the particular case." Russ v. State, 140 Fla. 217, 191 So. 296, 298 (Fla. 1939). See also State v. Greene, 348 So.2d 3, 4 (Fla. 1977). In this case, Azima omitted giving Schmidt a blood test which, according to expert testimony, a reasonably prudent doctor would do. Furthermore, he inserted an IUD in Schmidt because the urine and pelvic exams were negative, which a reasonably prudent doctor would not do. Therefore, were this a civil case, we would be able to agree that there was sufficient evidence of culpable negligence. However, to justify criminal sanctions for culpable negligence, the degree of negligence must be as high as that required for the imposition of punitive damages in a civil case. To obtain punitive damages in a civil case, a plaintiff must prove that the defendant's negligence was of:
[a] gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.
Greene, 348 So.2d at 4; Russ, 191 So. at 298. Cf. Como Oil Co., Inc. v. O'Loughlin, 466 So.2d 1061 (Fla. 1985) (the negligent filling of underground gas tanks which resulted in an explosion, although gross negligence, was not willful and wanton misconduct equivalent to criminal manslaughter which would support punitive damages).
This court has defined culpable negligence as "consciously doing an act which a reasonable person would know is likely to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with utter disregard for the safety of another." Tsavaris v. State, 414 So.2d 1087, 1088 (Fla. 2d DCA 1982) (emphasis added). The experts at Azima's trial all testified that the insertion of an IUD in a pregnant woman created a possibility of great bodily harm which could potentially threaten the patient's life. However, none of these doctors testified that such a negligent insertion would likely result in death or great bodily harm. In fact, during cross-examination, *187 one of the experts who had treated Schmidt was questioned as follows concerning the medical risks to Schmidt while she was pregnant with the IUD:
Q And you explained to her that if there's an IUD there, there's a high risk?
A There is a risk.
Q There is a risk?
A You said high risk.
Q Did you say high risk?
A No.
Q Because there wasn't a high risk?
A There isn't a high risk but there is a risk.
It is the likelihood of death or great bodily harm from the negligent act or omission which justifies the imposition of criminal sanctions for culpable negligence. Under the facts of this case, there was no evidence that Azima's negligent insertion of the IUD into Schmidt would likely cause death or great bodily harm. In the absence of such evidence, the jury could not convict Azima of culpable criminal negligence. The circuit court order is quashed and set aside and the matter is remanded to the trial court with instructions to set aside the judgment and sentence entered herein.
CAMPBELL and HALL, JJ., concur.