755 So.2d 796 (2000)
David ARNOLD, Appellant,
v.
STATE of Florida, Appellee.
No. 2D98-4857.
District Court of Appeal of Florida, Second District.
April 14, 2000.
*797 James Marion Moorman, Public Defender, and Douglas S. Connor, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Jenny S. Sieg, Assistant Attorney General, Tampa, for Appellee.
CASANUEVA, Judge.
David Arnold appeals his conviction for child neglect, a third degree felony in violation of section 827.03(3)(c), Florida Statutes (1997). Because the State did not prove a prima facie violation of the statute, the trial court erred in failing to grant Mr. Arnold's motion for judgment of acquittal at the conclusion of the State's case-in-chief. Accordingly, the conviction must be vacated.
Section 827.03(3)(a)1 defines "neglect of a child," as applied to this case, as "a caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain a child's physical and mental health, including, but not limited to food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child." As stated in subsection (3)(a)2, that failure or omission can be based on repeated conduct or, as in this case, "on a single incident or omission that ... could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death to a child." Subsection (3)(c) of the statute, with which Mr. Arnold was charged, does not require that the State prove that the child has actually suffered any "great bodily harm, permanent disability, or permanent disfigurement," only that the caregiver has placed her at risk. However, even if the defendant's conduct or omission has the potential to cause serious physical or mental injury or risk of death to the child, that "neglect" becomes criminal only when the State proves that the caregiver has acted "willfully or by culpable negligence."
By its language, the legislature has demanded that the State prove more than mere negligence to criminalize child neglect. And the legislature has required that the defendant's acts or omissions create a "reasonably expected" potential for the child to suffer, at a minimum, serious injury. In establishing these elements for the crime of third degree felony child neglect, the legislature has responded to a series of decisions from the Florida Supreme Court declaring unconstitutional prior versions of this statute. The primary infirmity of the 1975 version of the statute was that it criminalized simple negligence and punished those with no intent to do wrong. See § 827.05, Fla. Stat. (1975); State v. Winters, 346 So.2d 991 (Fla.1977). The 1991 version of section 827.05 had added language addressing the financial ability of the caregiver and the degree of impairment or risk to the child, but those elements did not overcome the lack of scienter. See State v. Mincey, 672 So.2d 524 (Fla.1996); State v. Ayers, 665 So.2d 296 (Fla. 2d DCA 1995). The latest version of the statute, under which Mr. *798 Arnold was convicted, has attempted to remedy that shortcoming by adding the "willfully or by culpable negligence" language and has further attempted to define what actions or omissions constitute "neglect."
We have made this short digression into the background of this statute not because any party has challenged its constitutionality but to emphasize how difficult it has been for the legislature to define this crime. The fact that the legislature has been struggling to do so for the past several decades manifests a strong public policy in favor of providing criminal sanctions for those caregivers who neglect children, a policy we have not ignored in deciding this appeal. At the same time, however, the legal precedents have acknowledged that only the most egregious conduct, done either willfully or with criminal culpability, should be criminalized.
This court has defined culpable negligence as "consciously doing an act which a reasonable person would know is likely to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with utter disregard for the safety of another." Azima v. State, 480 So.2d 184, 186 (Fla. 2d DCA 1985) (citing Tsavaris v. State, 414 So.2d 1087, 1088 (Fla. 2d DCA 1982)). The degree of culpable negligence necessary to sustain a conviction was set forth in State v. Greene, 348 So.2d 3 (Fla. 1977):
This Court is committed to the rule that the degree of negligence required to sustain imprisonment should be at least as high as that required for the imposition of punitive damages in a civil action. The burden of proof authorizing a recovery of exemplary or punitive damages by a plaintiff for negligence must show a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.
348 So.2d at 4 (quoting Russ v. State, 140 Fla. 217, 191 So. 296, 298 (1939)). Such acts are known by the public to be criminally outlawed. Id. "Willfully," by contrast, is a term more susceptible of comprehension by the ordinary reasonable person. In the context of criminal violations, "willfully" implies that a defendant has acted voluntarily and consciously, not accidentally. See Black's Law Dictionary 1773 (4th ed. 1968). With these elements and definitions in mind, we have determined as a matter of law that the trial court should have granted the defense motion for judgment of acquittal.
The State's case consisted of only two witnesses: the defendant's child, Tiffany Arnold, and the investigating officer. Responding to an anonymous telephone call, Officer John Belk of the Tampa Police Department, accompanied by a back-up officer and a social worker from the Department of Health and Rehabilitative Services, was dispatched to Mr. Arnold's trailer located in the Historia Mobile Home Park shortly after 8 p.m. one evening. Upon being admitted to the trailer by Mrs. Arnold, Officer Belk found the home grimy, smelly, and repulsive. Garbage littered the floor, spoiled and decomposing food was strewn about, and feces were smeared on the living room floor and were piled in another room. As to the latter, a large puppy appeared to be the culprit. A plywood board with nails protruding outward had been left where someone could step on it. A steak knife, partially covered by a newspaper, also lay on the floor. In what appeared to be a child's room, the mattress had been so badly shredded that the coils had poked through the covering. The officer noticed a fuse box with exposed wiring and mold between the doors of the refrigerator. He *799 heard cockroaches skittering and was bitten by fleas, although he did not see any flea bites on the child.
Officer Belk spoke with Tiffany, who told him that she microwaved her food. He did not inquire whether she had eaten any of the spoiled food. She was wearing a dress but no shoes and she looked as if she had gotten dirty while playing. Mr. Arnold, who arrived a short time later in an apparently intoxicated condition, told the officer that he was in the process of making repairs to the trailer. Mr. Arnold said that none of the exposed wiring was connected to electric current, and Officer Belk did admit seeing some power tools and repair manuals lying on the trailer's floor. Some of the walls looked as if they had recently been plastered.
Tiffany testified that her parents would leave her with a babysitter when they both left; otherwise her parents took care of her. She testified that she had not been sick that day and that she had eaten the day the officer visited. She also explained that before the puppy had torn apart her mattress with his sharp teeth, she had slept in her bedroom. Since then, however, she slept on the couch in the living room.
Photographs taken of the trailer on the date in question demonstrated how unclean the trailer was. At one point the Assistant State Attorney argued to the trial court that they were "the whole case." Although pictures might have spoken a thousand words, they could not and did not satisfy the State's burden of proving that the elements of the statute had been met.
The first deficiency in the State's case was its failure to bring forth evidence to establish that the conditions in the trailer put the child at risk of serious physical or mental injury. Although expert testimony is not required on this issue, the evidence should nevertheless have demonstrated that Mr. Arnold's act or omission created a potential risk of seriousnot minimalharm to the child. None of the evidence met that legal standard. Tiffany was nine when her father was arrested. She was competent to avoid hazards or situations that otherwise might seriously injure a very young child or even put the child at risk of death. Without evidence that the knife was sharp enough to cut or was in a dangerous position, that the nails in the plywood could not be avoided, that electrical current ran through the exposed wiring, that the unsanitary conditions could cause Tiffany to become seriously ill or even to die, or that Tiffany went unclothed, unsupervised, or unfed, that element of the statute has not been proven. In fact, some of the evidence specifically contradicted those conclusions.
Assuming, however, that the proof was sufficient to meet the statutory definition of "neglect," the State was also required to prove Mr. Arnold acted willfully or with culpable negligence in creating the situation or in permitting the suspect conditions to exist. The State presented no direct or circumstantial proof of Mr. Arnold's actual knowledge. Mr. Arnold was not present when the officers arrived, and there was no evidence showing how long he had been away. Nothing established how long the home had been unclean. Such information was critical for a trier of fact to properly infer that Mr. Arnold's acts or omissions were knowing and intentional, or done with such wanton or careless indifference to Tiffany's well-being as to be practically intentional.
It is apparent that child neglect is a difficult (but we think not impossible) crime to prove. Without strict attention to the legal sufficiency of the evidence in any given case, however, our courts risk making this a strict liability crime. Fortunately, when children live in conditions similar to these, which are unclean but not significantly dangerous, or when their parents or caregivers are negligent but not criminally so, our child welfare system can provide services to help those children and the adults responsible for them. As set out in section 39.001(1)(a), Florida Statutes *800 (1999), the expressed goal of chapter 39 ("Proceedings Relating to Children") and of the courts enforcing that comprehensive statutory scheme, is to "provide for the care, safety, and protection of children in an environment that fosters healthy social, emotional, intellectual, and physical development."
Reversed and remanded with instructions for the trial court to grant the motion for judgment of acquittal and to discharge Mr. Arnold.
FULMER, A.C.J., and SALCINES, J., Concur.