790 So.2d 489 (2001)
Freddie Lee MOORE, Appellant,
v.
STATE of Florida, Appellee.
No. 5D00-1992.
District Court of Appeal of Florida, Fifth District.
June 15, 2001.
Rehearing Denied July 25, 2001.
*490 James B. Gibson, Public Defender, and Anne Moorman Reeves, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellee.
PLEUS, J.
Freddie Lee Moore was convicted of willful or culpable neglect of a child causing great bodily harm.[1] The child, Moore's son, apparently died as a result of brain damage from being shaken. The jury acquitted Moore of a separate charge of aggravated manslaughter of a child.[2] Moore asserts the trial court should have granted his motion for a judgment of acquittal. In this case, the only proof of guilt is circumstantial. Thus, a conviction may not be sustained no matter how strongly the evidence may suggest guilt, unless the evidence is inconsistent with any reasonable hypothesis of innocence. Our standard of review is not whether the evidence failed to exclude every reasonable hypothesis but that of guilt, but whether there was competent evidence for a jury to so decide. Porter v. State, 752 So.2d 673 (Fla. 2d DCA 2000). Applying this standard, we find that appellant's conviction of the offense of neglect of a child causing great bodily harm must be affirmed.[3]
Baby Franklin Taylor Moore arrived at Princeton Hospital at approximately 2:00 a.m., Tuesday, July 27, 1999. He was transferred to Arnold Palmer Hospital where he was seen by Dr. Mary Farrell around 6:00 a.m. Retinal hemorrhages in the backs of both eyegrounds *491 were indicative of "shaken-baby" syndrome. A forensic pathologist, Dr. Sara Hyatt Irrgang, performed an autopsy of Franklin on the morning of July 28, 1999. The autopsy revealed, in addition to hemorrhages of the brain, a less than twoinch fracture of a "somewhat crescent" shape on the back occipital bone.
In the days and hours before Franklin's death, he was in the care of his natural parents, April O'Sullivan Robinson and Freddie Lee Moore. Hours after Franklin's death, Moore agreed to talk to the police in a recorded interview. He was reinterviewed two days later.
In the first interview, Moore explained that on the day before Franklin died, he sat with the baby boy from two in the afternoon until about 11 p.m. when he went to pick up Robinson from her work. After picking up another of Robinson's children, three-year-old Kayne, from a nursery, the couple returned with the children to Robinson's apartment. Around midnight, Moore left the apartment and went to a convenience store where he stayed for some time with friends. He returned to the apartment between 1:45 a.m. and 2:00 a.m. After Moore returned, the mother checked on Franklin and noticed he was not breathing. Moore called 911 and Franklin was transported by ambulance to Princeton Hospital. Moore was asked by one of the detectives if he had done anything to Franklin, either accidentally or intentionally, which may have caused the baby to become injured. Moore answered "no" to both questions and also denied having any knowledge of the mother causing such an injury. During this first interview, Moore also mentioned that Franklin had been sick over the weekend, vomiting on both Friday night and during the day on Saturday. On Sunday, the vomiting had stopped but Moore did notice Franklin was eating a little less than usual and being less active than normal.
In the second interview, Moore told the detectives that on the previous Saturday, which would have been July 24, 1999, while he was bathing Franklin, he had him laying across the sink area on a towel when Franklin kicked and tumbled head-first into the bathtub. Because Franklin breathed in water and was gasping for air, Moore picked him up and began to shake him to dry him off. He then laid him down in the living room and Franklin appeared to be fine. Moore thought it likely that the baby hit the rim of the tub before falling into the water. On Monday, Moore thought the baby became even more lethargic, sleeping for most of the day.
The state filed an information charging Moore with aggravated manslaughter of a child and neglect of a child causing great bodily harm. The state's information against Moore on the neglect charge alleged that between July 23, 1999 and July 28, 1999 Moore willfully or by culpable negligence, while a caregiver of a child under 18, failed to provide that child with the care necessary for the child to maintain his health or failed to protect the child from abuse or neglect, and in so doing, caused the child to have great bodily harm. The charging document oddly failed to describe the specific acts or even the courses of conduct or neglect which formed the basis of either the neglect or the manslaughter charge.[4] Ultimately, however, *492 the jury was made aware that there was alleged a Saturday night incident on July 24 in which Moore admitted to having dropped the baby into the tub from the edge of the sink and that another incident producing injury likely took place in the hours before the baby's death.
According to the state's medical expert, the baby's death early Tuesday morning, July 27, occurred as a result of excessive shaking of the baby sometime within, at the most, the prior eight hours. The jury, by its complete acquittal of the appellant as to the charge of aggravated manslaughter, including all its lesser included offenses, absolved appellant of any responsibility for the baby's death by shaking during either Monday evening or early Tuesday morning. In order to find Moore guilty of the separate count of neglect causing great bodily harm, and still fully absolve Moore of the manslaughter charge, the jury essentially had to find that the Saturday night bathtub incident caused the baby to incur great bodily harm and that Moore was "culpably negligent" with respect to that incident and/or in his subsequent failure to seek medical advice.
After a careful review of the record, we conclude that the state met its burden of showing that the injury which occurred on Saturday night constituted great bodily harm. Dr. Irrgang, who performed the autopsy, noted a less than two-inch crescent shaped fracture on the back occipital bone of the head. The fracture indicated to Irrgang that instead of having just been shaken, the baby had been pitched against a hard surface. Dr. Irrgang estimated that the fracture was, at a maximum, two to three days old.
Apparently, the jury concluded that the fall onto the rim or side of the tub was hard enough to produce the fracture. The jury further was able to conclude that Moore was culpably negligent in allowing the baby to fall in the manner that it did, and/or in failing, in the next two days before the baby's death, to seek medical advice. Culpable negligence is conscientiously doing an act which a reasonable person would know is likely to result in death or great bodily harm. Arnold v. State, 755 So.2d 796, 798 (Fla. 2d DCA 2000). To allow the baby to fall in a manner which produced a skull fracture, to recognize that the baby was noticeably inactive in the following two days, and to refrain from seeking medical counsel during this subsequent period, could constitute culpably negligent conduct which caused great bodily harm.
AFFIRMED.
COBB and PALMER, JJ., concur.
NOTES
[1] § 827.03(3)(b), Fla. Stat. (1999).
[2] § 782.07(3), Fla. Stat. (1999).
[3] § 827.03(3)(C), Fla. Stat. (1999).
[4] The record does not reveal that Moore ever filed a motion for a statement of particulars. Fla. R.Crim. P. 3.140(n). See Carver v. State 560 So.2d 258, 260 (Fla. 1st DCA); rev. denied 574 So.2d 139 (Fla.1990) ("An information that completely fails to charge a crime is fundamentally defective. However, where the charging allegations are merely incomplete or imprecise, the failure to timely file a motion to dismiss under Rule 3.190(c) waives the defense, and it cannot be raised for the first time on appeal").