NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

TYLER JOHN POCZATEK,          )
                              )
          Appellant,          )
                              )
v.                            )          Case No. 2D16-276
                              )
STATE OF FLORIDA,             )
                              )
          Appellee.           )
_____)

Opinion filed March 10, 2017.

Appeal from the Circuit Court for Collier
County; Lauren L. Brodie, Judge.

Donald P. Day of Law Office of Donald Day,
Naples, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Brandon R. Christian,
Assistant Attorney General, Tampa, for
Appellee.


MORRIS, Judge.

          Tyler John Poczatek appeals his convictions after a jury trial for felony

battery and aggravated child neglect.  We affirm his conviction for felony battery without

comment, but we reverse his conviction for aggravated child neglect because the State

did not present sufficient evidence of that offense.

## I. Facts

On April 28, 2014, Poczatek was charged with aggravated child abuse and aggravated child neglect based on an incident that occurred on February 25, 2014, involving his girlfriend's three-year-old son, C.R. He proceeded to trial on November 30, 2015.

At trial, the child's mother, T.R., testified that she was dating Poczatek when the incident occurred. She and C.R. had lived with Poczatek previously, but at the time of incident, Poczatek lived with his father. On the night of the incident, T.R. had asked Poczatek to watch C.R. while she went to the gym in Poczatek's neighborhood. T.R. and her friend from work ran from the house to the gym. When she was working out, she received a message from Poczatek telling her to be quiet when she got back because C.R. was asleep. She thought nothing of it because it was close to C.R.'s bedtime. She and her friend worked out for a total of forty minutes before they headed back. On their way back, T.R. received two phone calls from Poczatek. She answered the second one, and Poczatek told her that C.R. "had fallen." She heard "heavy breathing" in the background. She immediately called 911.

When T.R. returned to the house, she saw C.R. in the front passenger seat of Poczatek's car, which was parked in the driveway. C.R. was "stiff, bleeding, [and] uncomfortable." T.R.'s friend got C.R. out of the car and placed him on a towel on the floor of the garage. T.R. described Poczatek as panicked. He told T.R. that "[C.R.] was jumping on the stairs in the garage" and "that he had hit [Poczatek's] car frontward and then fell backwards on the stairs."

An ambulance responded and took C.R. to Lee Memorial Hospital. T.R. described C.R.'s appearance at the hospital as mangled. She noticed bruising and cuts on his face, and she had noticed when he was being put on a stretcher at the house that "the right side of his head was swollen." C.R. was eventually taken to Tampa General Hospital. C.R. was in the hospital for approximately three weeks. C.R. had multiple therapy sessions and had to relearn basic skills. He "will forever be listed as 'TBI,' which is Traumatic Brain Injury." There are concerns about C.R.'s eyesight and his possible intellectual deficiencies. Two to three weeks after the incident, Poczatek told T.R. a different story about what happened. He told her "that he was hanging [C.R.] upside down, swinging him, and [Poczatek] accidentally, dropped him."

On cross-examination, T.R. testified that it was not unusual for Poczatek to play with or babysit C.R. When she returned to the house after working out and saw C.R. in the front seat of Poczatek's car, she assumed that Poczatek was about to take C.R. to the emergency room. The ambulance arrived shortly after she returned to the house.

C.R. also testified. He was five years old at the time. When asked if something had happened with him and Poczatek, C.R. answered: "[H]e slammed me on the head." C.R. was asked where in the house this happened, and he answered "[i]n the garage, floor." C.R. denied that he played with Poczatek, although he agreed that Poczatek had babysat him before. C.R. does not like Poczatek anymore: "I didn't like it when he slammed me on the head." They were in the garage when it happened, and Poczatek had been waxing his car. C.R. did not remember Poczatek swinging him or picking him up, but he did remember Poczatek tickling him. Then, Poczatek picked him

up by his waist and slammed him on the head. C.R. said that Poczatek held C.R. over his head and threw C.R. "really hard." Right before that happened, Poczatek had been playing with and tickling C.R.

T.R.'s friend testified that she had been working out with T.R. on the night of the incident. When they returned to the house, C.R. was in Poczatek's car and appeared to be unconscious. She did not think "him being in the front seat was right," so she laid him on the floor. Later, Poczatek drove her back to her car and tried to explain what happened. She said that Poczatek told two stories, one about the stairs and one about the vehicle, but she could not recall exactly what Poczatek said. She did not ask him any questions because she did not want to listen. On cross-examination, she admitted that she never told law enforcement in her statement that Poczatek told two stories. She was not clear if he had told two stories.

The responding deputy testified that he observed C.R. lying on a towel in the garage. The deputy observed "blood coming from his ear canal, filling up in his ear canal." The child was making noises but was unresponsive. The child also had a large welt behind his right ear and "some bruising that was appearing on his face." His skin was flushed, and he had an abrasion on his elbow. He asked T.R. to retrieve a pillow, and the pillow she retrieved had blood on it. Poczatek explained to the deputy that Poczatek was in the garage cleaning his car when he heard the door open from the house and heard C.R. fall down the stairs. Poczatek did not tell the deputy that he was wrestling with C.R. or swinging him into the air. Poczatek told the deputy that after C.R. fell, C.R. wanted to watch television so Poczatek picked him up and put him in bed in the bedroom. The State introduced photographs of C.R.'s injuries.

- 4 -

The trauma surgeon who treated C.R. at Lee Memorial Hospital testified that C.R. was unresponsive when he was brought to the emergency room. The paramedics were assisting his breathing, so the hospital staff put in a breathing tube. C.R. had a Glasgow Coma Score of 8, which is considered comatose. A CT scan of the head and brain showed "multiple skull fractures, primarily toward the back, right of the head," bleeding around the brain, and bruising and swelling of the brain. One of the fractures was unusual: "[T]he skull, itself, had not only cracked, but it had completely offset or had been displaced by a width of the bone itself, and that signifies a very significant amount of kinetic energy to cause that type of injury." C.R. also had bruising to both elbows and an abrasion around his belly button. The doctor did not notice bruising on the child's face. As soon as the injuries were diagnosed, the child was transported to Tampa General Hospital.

The surgeon testified that it was possible but unlikely that the child's injuries were caused by the child running or falling down on his own. This is because the child could not generate enough kinetic energy. It was also highly unlikely that the injuries were caused by an adult holding the child by the child's legs and dropping the child. The brain and skull injuries were caused by blunt force trauma. It was probable that the child was picked up and thrown down on a hard surface with an edge. The doctor testified that the child would have probably become symptomatic immediately after suffering these injuries, meaning he would have lost consciousness to some degree and he would have begun bleeding out of his ear. On cross-examination, he clarified that every brain injury is different and that a person could become symptomatic within five seconds to five hours.

A detective testified that he responded to Poczatek's home after the incident. In Poczatek's bedroom, the detective noticed a glass with what appeared to be blood on it. The bed was missing a pillow that had been taken to the garage. The pillow and a towel in the garage also appeared to have blood on them. None of the items were tested because there was no indication that the blood belonged to anybody other than the victim.

The emergency room physician who treated C.R. at Tampa General Hospital testified that C.R. had skull fractures and brain bleeding and bruising. She described the injuries as blunt impact trauma. She testified that such injuries would cause a child to be immediately symptomatic and that the child would deteriorate within a few hours. It was very unlikely that the injuries were caused by the child's falling because "[i]t takes a lot of energy to do that much damage." It was also very unlikely that the injuries were caused by the child's being dropped; the injuries were more consistent with "additional force being applied" on the side of his head. The physician testified that people have protective reflexes when they are falling or being hit but that she did not document any injuries on his hands. On cross-examination, she stated that it would not be unreasonable for a person to have protective reflex injuries on their elbows. She did not document any elbow injuries on C.R., and she had not reviewed all of the medical records in the case. She was not surprised to hear that the other physician found marks on C.R.'s elbows. The physician testified that contact on a sharp corner of a stair or a table has much greater impact than contact on a flat surface. On redirect examination, she stated that she believed that C.R.'s injuries were from more than one instance of blunt force trauma.

A child protective investigator testified that he responded to Tampa General Hospital and spoke to C.R.'s treating doctors, T.R., and Poczatek. Poczatek told the investigator that Poczatek was waxing his car when C.R. was jumping down the steps and fell down. Poczatek did not see C.R. fall but heard him fall. Poczatek told the investigator that he picked C.R. up and took C.R. to his bathroom and then his bedroom. Poczatek applied ice to C.R.'s head, and C.R. said he was fine and wanted to watch Power Rangers. Poczatek left C.R. in the bedroom and went back to work on his car. Poczatek later checked on C.R. and noticed that he was having difficulty breathing. That is when Poczatek called T.R. and got ready to take C.R. to the hospital. Poczatek never told the investigator that he was wrestling with the child or that he had dropped the child.

The State also introduced photographs of the garage and Poczatek's bedroom as well as photographs of C.R.'s injuries.

The defense presented the testimony of an expert forensic pathologist and neuropathologist. He testified that in rare cases, a short fall can cause a fracture or death. He reviewed the records in this case. He testified that one impact can cause multiple fractures, "especially in this case." He said that a respiratory mask could cause facial bruising and that a neck collar placed on the child by EMS could cause the marks on the back of his ear. It was more than probable that C.R.'s injuries were caused from "throwing the child to the side and him hitting concrete." On cross-examination, the doctor testified that his work mostly involves performing autopsies and that he does not generally deal with child abuse patients. The doctor testified that people are symptomatic immediately after a skull injury but that some people do not show

symptoms until ten minutes to several hours later. Most kids would have symptoms early on, such as unconsciousness or bleeding out of the ear canal. Swinging the child or throwing him down would increase the chance of his receiving a significant injury, such as a skull fracture with bleeding inside the brain. The doctor testified that the injuries were consistent with an adult's throwing the child on the ground but were also consistent with the child's running and falling.

Poczatek's father, John, testified that Poczatek lived with John at the time in question. On the night of the incident, Poczatek called John in a panic. John advised Poczatek on what to do, and John also told the police what he had told Poczatek to do. A couple of weeks later, Poczatek came to John crying and upset. Poczatek had something to tell John, but John did not testify regarding what Poczatek had told him. On cross-examination, John testified that T.R. and the child would often spend the night at John's house, although John did not know the last name of T.R. or the child.

Poczatek testified in his own defense. He and T.R. began dating in May 2014. They lived in an apartment together for four months, but when the lease expired, he moved into his father's house. Frequently when T.R. worked, Poczatek would babysit the child. He was very close with C.R. and got along with him well. Poczatek never struck the child in anger or spanked him on the rear end.

On the night of the child's injuries, Poczatek was watching the child while T.R. went to the gym with her friend. He hung out with the child and then put on a movie for him to watch in the bedroom while Poczatek did some things. When Poczatek checked on the child, the child was sleeping, so Poczatek turned off the television and went to the garage to work on his car. At some point, the child walked

out into the garage. Poczatek asked the child why he was not sleeping and "picked him up" and tickled him. They were "playing around, goofing around, [and] wrestling," like they always did. Poczatek would often tickle the child, and the child would laugh like kids do. Poczatek testified: "I picked him up by his stomach and then I flipped him over and I was swinging him by his ankles." Poczatek demonstrated how he would swing the child, saying that he did this sometimes. As he was swinging the child, the child slipped out of Poczatek's hands. Poczatek immediately ran over to the child and picked him up. The child was crying and holding his head. Poczatek took the child to the bedroom and laid him down on a pillow on the bed. The child was breathing heavily, so Poczatek went to get him a glass of water. Poczatek called his father, with whom he is very close. When Poczatek returned with the water, he noticed blood dripping from the child's ear. Poczatek freaked out. When he hung up with his father, he decided to take the child directly to the hospital. He picked him up and took him to the car in the driveway. He called T.R. twice, and when she answered the second time, he told her that there had been an issue with C.R. He did not call 911 because he lived thirty to forty-five seconds from Naples Community Hospital. After he got to the car with C.R., T.R. returned and she and her friend got C.R. out of the car. Someone else had called EMS, which arrived shortly after T.R. arrived.

C.R. was taken to Fort Myers Hospital and then to Tampa, and Poczatek went to both hospitals. Two weeks later, Poczatek called T.R. and told her detailed information. He also called his father with that information. He never intended to cause C.R. any harm; he did not intentionally try to hurt C.R. or cause him any kind of injury.

He would have never intentionally harmed C.R., and he had a good relationship with C.R.

On cross-examination, the State asked Poczatek if he knew he was supposed to call 911 if a child is unconscious, and Poczatek answered that the child was not unconscious. He admitted that if the child was unconscious, he should have called 911. He denied that when he normally babysat C.R., his father or mother was usually around, and he denied that three-year-olds bothered him. He said he "enjoyed the kid." He admitted that "all these stories about [C.R.] falling off the steps and hitting the car" were untrue. He admitted lying to his own father, T.R., and the medical providers and that he did not tell T.R. and his father the truth until two weeks later. He lied because he did not want to disappoint his father.

C.R. was not dressed in his pajamas but was still wearing his daytime clothes. Poczatek admitted that T.R. was not the first person he called when C.R. was injured. Poczatek denied that C.R. did anything to make him mad or angry. When C.R. fell out of Poczatek's hands, the back of C.R.'s head hit the stairs. Poczatek did not hit C.R. in the face, and C.R.'s face did not hit the floor. C.R. was not unconscious, but he was groaning and moaning. He could not stand on his own. At some point, his eyes closed and did not open again, which is when Poczatek took him to the car to take him to the hospital. Poczatek maintained that it was an accident. He admitted that it was stupid for him to swing the child.

The defense also presented the testimony of T.R., who said that when she dropped off C.R. at Poczatek's house, Poczatek was planning to wash or detail his car.

The defense rested and then moved for a judgment of acquittal on the charge of neglect. Poczatek argued that there was insufficient evidence "that there was any act of [Poczatek] that could constitute an intentional act to cause harm." The State responded that it presented evidence of "his failure to supervise the child or get him to the hospital timely" and that that was "enough evidence for this to go in front of the jury." The State argued that there was a period of time during which Poczatek did not seek medical care for the child. The defense argued that there was "nothing at all from any of the medical experts to say that any delay from the second this occurred, until the time that the EMS arrived, caused any additional damage or other problems with this child." The defense further argued that there was no evidence that Poczatek's actions in failing to call 911 were either willful or culpable negligence. The trial court denied the motion.

On count one, the jury found Poczatek guilty of felony battery, the lesser included offense of aggravated child abuse, and on count two, the jury found him guilty of the charged offense of aggravated child neglect. The trial court sentenced Poczatek to five years in prison on the felony battery. On count two, the trial court sentenced him to ten years in prison followed by five years' probation, to run concurrently with the sentence on count one.

## II. Analysis

On appeal, Poczatek contends that the trial court erred in denying his motion for judgment of acquittal on count two because the State failed to present any evidence that he willfully or by culpable negligence failed or omitted to provide C.R. with care or services necessary to maintain C.R.'s health and that Poczatek's failure or omission resulted in great bodily harm, permanent disability, or disfigurement.

- 11 -

We review de novo the denial of a motion for judgment of acquittal. Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). "A motion for judgment of acquittal is designed to challenge the legal sufficiency of the evidence." State v. Odom, 862 So. 2d 56, 59 (Fla. 2d DCA 2003) (citing State v. Williams, 742 So. 2d 509, 510 (Fla. 1st DCA 1999)). The State is required to prove every element of an offense, and when it has failed to do so, "the case should not be submitted to the jury[] and a judgment of acquittal should be granted." Baugh v. State, 961 So. 2d 198, 204 (Fla. 2007) (quoting Williams v. State, 560 So. 2d 1304, 1306 (Fla. 1st DCA 1990)).

The State charged Poczatek with both aggravated child abuse and aggravated child neglect in violation of section 827.03, Florida Statutes (2013). With regard to aggravated child neglect, section 827.03(2)(b) provides that "[a] person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree."

The State's theory of aggravated child neglect was that Poczatek failed to obtain medical services or treatment for C.R. after C.R. initially sustained the injuries. However, the State did not present any evidence that Poczatek acted or failed to act in a way that caused further harm to C.R. after he suffered the initial injuries. The State's evidence focused on C.R.'s injuries that were the result of an impact and Poczatek's role in that impact, but there was no evidence from which the jury could have found that Poczatek's actions after the incident exacerbated the injury in any way. In other words, there was no evidence that Poczatek's conduct after the incident caused "great bodily harm, permanent disability, or permanent disfigurement" to C.R. Thus, the trial court

erred in denying Poczatek's motion for judgment of acquittal on the charge of aggravated child neglect because the injury element of that offense was not proven.

We also conclude that the State failed to present evidence that Poczatek willfully or by culpable negligence neglected the child, i.e., that Poczatek committed the lesser included offense of child neglect. See § 827.03(2)(d) ("A person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree . . . ."); § 924.34, Fla. Stat. (2013) (providing that "[w]hen the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty . . . , the appellate court shall reverse the judgment and direct the trial court to enter judgment for the lesser degree of the offense or for the lesser included offense" that was sufficiently proven). Relevant to the facts of this case, "[n]eglect of a child" means "[a] caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including, but not limited to . . . supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child." § 827.03(1)(e)(1). "[N]eglect of a child may be based . . . on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child." § 827.03(1)(e).

Even where the incident or omission could reasonably be expected to result in serious injury or death to the child, "that 'neglect' becomes criminal only when the State proves that the caregiver has acted 'willfully or by culpable negligence.' " Arnold v. State, 755 So. 2d 796, 797 (Fla. 2d DCA 2000). "[W]illfully" means that the

defendant "acted voluntarily and consciously, not accidentally." Id. at 798. "[C]ulpable negligence is more than a failure to use ordinary care for others. For negligence to be called culpable negligence, it must be gross and flagrant [and] committed with an utter disregard for the safety of others." Burns v. State, 132 So. 3d 1238, 1240 (Fla. 1st DCA 2014) (quoting Fla. Std. Jury Instr. (Crim.) 16.5). By its language in section 827.03, "the legislature has demanded that the State prove more than mere negligence to criminalize child neglect. And the legislature has required that the defendant's acts or omissions create a 'reasonably expected' potential for the child to suffer, at a minimum, serious injury." Arnold, 755 So. 2d at 797. "[O]nly the most egregious conduct, done either willfully or with criminal culpability, should be criminalized." Id. at 798.

The State's evidence demonstrated that the child suffered an injury in the care of Poczatek, but the State did not present evidence that Poczatek willfully or by culpable negligence neglected the child after he suffered the injury. C.R. was in the care of Poczatek for approximately forty-five minutes. C.R.'s treating doctors testified that his injuries were caused by blunt force trauma. But the doctors also testified that a person who has suffered such injuries may not show symptoms immediately; it may take minutes to hours before the person shows symptoms. There was no evidence that Poczatek knew or should have known immediately that C.R. had a skull fracture or brain injury. There was evidence of blood in Poczatek's bedroom, but it was consistent with Poczatek's testimony that he took C.R. into the bedroom because the child was crying and hurt. In the bedroom, Poczatek noticed that C.R. was bleeding from his ear and would not open his eyes, and it was then that Poczatek decided that C.R. needed medical treatment. Poczatek then took C.R. to the car, and T.R. and her friend both

- 14 -

testified that Poczatek had already placed the child in the car when they returned to the house.

We conclude that the evidence did not show that Poczatek voluntarily and consciously, or grossly and fragrantly, failed to seek necessary medical services for the child when such failure could have reasonably been expected to result in serious physical injury or a substantial risk of death to C.R. See Weeks v. State, 832 So. 2d 954, 956 (Fla. 2d DCA 2002) (holding that defendant's motion for judgment of acquittal should have been granted because there was no evidence "as to what 'could reasonably be expected' from the lack of dental care" that defendant failed to seek for her child); Burns, 132 So. 3d at 1242 (holding that State did not prove child neglect based on defendant's decision to call the child's mother rather than 911 where the "only evidence in the record regarding a timeline was that the mother returned home within [ten] minutes of the call" and "[t]here was no . . . evidence presented that [defendant] should have known [the child's] injuries were so significant that any delay in calling 911 was likely to cause her death or great bodily harm"); cf. Moore v. State, 790 So. 2d 489, 492 (Fla. 5th DCA 2001) (holding that trial court properly denied defendant's motion for judgment of acquittal on charge of aggravated child neglect where defendant allowed the baby to fall in a manner which produced a skull fracture and failed to seek medical assistance for baby in the two days following the injury even though defendant "recognize[d] that the baby was noticeably inactive" during those two days). While Poczatek's failure to immediately seek medical treatment may have been negligent, it did not rise to the level of a willful act or culpable negligence.

Accordingly, we reverse Poczatek's judgment and sentence for the offense of aggravated child neglect and remand for entry of a judgment of acquittal on that count. We affirm his judgment and sentence for felony battery.

Affirmed in part, reversed in part, and remanded.

NORTHCUTT and CRENSHAW, JJ., Concur.