MAKAR, J.
Jannette Ramos appeals her conviction and sentence for aggravated manslaughter of a child following the drowning death of her infant son in a retention pond close to her apartment. We affirm.
The only issue meriting discussion is whether the totality of Ramos’s acts, and failures to act, establish the culpable negligence necessary to sustain her conviction for manslaughter of a child.[1]
Florida imposes upon parents the responsibility to superase and protect their children who are too young to care for themselves. Machin v. Walgreen Co., 835 So.2d 284 (Fla. 3d DCA 2002). Here, the legal responsibility for the care of the youngest of Ramos’s five children, Nathan Cook, nineteen months old at the time he drowned, fell squarely upon her as his immediate caregiver. Mere negligence in the care of one’s young child doesn’t necessarily amount to culpable negligence. Things happen in the care of young children that are unexpected even by experienced parents; a one-time accident or misfortune that could not be reasonably expected to result in serious harm, without more, does not generally transform a parent into a culpably negligent criminal.[2] Close legal questions arise, however, because each tragic case involves the confluence of an innocent child’s death and a bereaved parent, whose degree of care, neglect, indifference, or callous disregard is measured against societal norms and expectations under the circumstances. What some judges might deem culpable negligence by a parent might be insufficiently egregious to others. See, e.g., Edwards v. State, 755 So.2d 443 (Miss.App.1999) (reversing, over a dissent, the culpa *1121 ble negligence manslaughter conviction of parents in the death of their four-year-old who drowned during camping trip due to insufficient evidence of culpable negligence). For this reason, we have reviewed the record closely to determine whether the jury was presented with sufficient evidence to believe Ramos was culpably negligent under the law.
 In Florida, culpable negligence is a “gross and flagrant” violation of a duty of care that causes injury, a course of conduct showing “reckless disregard of human life,” “such wantonness or recklessness” as to equal the intentional violation of the rights of others, or an “entire want of care” raising “the presumption of indifference to consequences.” Preston v. State, 56 So.2d 543, 544 (Fla.1952); Fla. Std. Jury Instr. (Crim.) 7.7. We evaluate the totality of the circumstances, as reflected in the record, in determining whether the facts presented constitute culpable negligence. Behn v. State, 621 So.2d 534, 537 (Fla. 1st DCA 1993). If the evidence is sufficient to establish a jury question regarding whether Ramos was culpably negligent, we must affirm. State v. Nowlin, 50 So.3d 79, 81 (Fla. 1st DCA 2010) (existence of a jury question precludes dismissal).
The initial impression of the detective investigating Nathan’s death was that it was accidental. But that impression was quickly erased. Several of Ramos’s neighbors came forward to tell of many repeated instances of Ramos’s failure to supervise Nathan in the months preceding his death. The neighbors were not surprised to learn that Nathan had died; they described the situation as a tragedy waiting to happen.
The testimony regarding Ramos’s neglect of Nathan was plentiful. Seven neighbors testified at trial that Nathan would frequently “escape” from Ramos’s second floor apartment, crawling down the outside stairs and going near the retention pond, placing the infant at serious risk. Frequently, neighbors saw Nathan descend the stairs from Ramos’s apartment by himself, unsupervised. Sometimes Nathan scooted down the stairs unfazed, but neighbors also saw him fall down the stairs and hit his head on the ground on multiple occasions.
One neighbor recounted two separate incidents where Nathan was unsupervised and roaming alone, requiring her to intervene and return him to Ramos’s apartment. The first time, the neighbor found Nathan wandering, alone, clothed only in a diaper, beside the retention pond. She took Nathan home to discover the apartment door wide open and Ramos nowhere to be found; only after the neighbor entered the apartment and called out several times did Ramos appear, talking on her mobile phone and wholly unaware that Nathan had been outside. The same neighbor found Nathan near the retention pond a second time and took him home, located on the other side of the building, where Ramos was simply standing around with other adults.
Another neighbor testified that, five to ten times, she found Nathan alone and unsupervised outside of the apartment, having “bounced down the stairway” from his second floor apartment. Each time she returned Nathan to his home, the front door would be open. Ramos never accepted responsibility, always casting blame on one of her other children for allegedly leaving the door open. Several other witnesses told similar stories: they found Nathan wandering outside, returned him to the apartment with its door open and Ramos oblivious to whether Nathan was missing. Many times Ramos would simply not bother to physically take control of Nathan upon his return; instead, she was *1122 preoccupied or too busy to do so — using the computer or talking on the phone. In fact, some neighbors reported that none of Ramos’s children, including Nathan, were ever supervised while they played outside.
Yet another neighbor noticed Nathan, while scampering around the pool at the apartment complex, fall into the spa area; a maintenance worker had to rescue him. Ramos did not notice that her child had fallen into the water or appear at the pool until the neighbor reported that Nathan was unsupervised in a risky area.
On the day of Nathan’s death, a witness thought he saw three turtles in the pond, but realized his error twenty to forty-five minutes later when he saw a distraught Ramos with Nathan on the shore of the pond where the “turtles” had been. As had occurred so often before, the apartment door was open, Nathan had wandered out one last time, and ultimately fell to his death in the retention pond.
Ramos argues that this evidence, as a whole, cannot support a finding that she acted with culpable negligence; she claims her motion for judgment of acquittal should have been granted. We disagree. Applying a de novo standard, we review the evidence in a light most favorable to the State, drawing all reasonable inferences in its favor. Jones v. State, 790 So.2d 1194, 1196-97 (Fla. 1st DCA 2001).
The totality of the circumstances encompasses events both on the day of Nathan’s death and at times leading up to that day, if they are relevant to show Ramos was culpably negligent. We have little pause to conclude that the totality of Ramos’s conduct was sufficient to create a jury question of whether she was culpably negligent in breaching her duty of care toward Nathan by allowing him repeatedly to wander, unsupervised, near the retention pond. Ramos argues that evidence of her numerous failures to supervise Nathan on many previous occasions cannot establish her culpable negligence on the day of Nathan’s death (when she was in the shower, allegedly leaving Nathan’s care in the hands of a very young sibling). Had this been a single isolated incident — without the history of Ramos’s repeated indifference and inaction as to Nathan’s safety — it might fall short of a “gross and flagrant” violation of a duty of care under a culpable negligence standard. Evidence of past neglect and indifference, however, is relevant to show that Ramos acted wantonly and recklessly on a continuous basis, exhibiting a pattern that she was indifferent to the dangerous and ultimately deadly consequences of her actions. The jury was entitled to make the reasonable inference that, after the many previous close calls and despite the many altruistic attempts of neighboring Good Samaritans, Ramos exhibited a degree of behavior that established a “gross and flagrant” -violation of a duty of care for Nathan or, alternatively, an “entire want of care” that created a presumption of indifference to the consequences of her conduct. A single lapse of judgment on a single day may be insufficient to show an “entire want of care,” but the evidence here shows a recurring series of increasingly disturbing lapses. This evidence was sufficient to create a jury question, under the totality of the circumstances, that Ramos had engaged in culpable negligence that breached her duty to supervise and protect Nathan.
We also conclude that Ramos’s culpable negligence caused Nathan’s death, and the exact length of time that Nathan was outside the apartment does not change our conclusion. It is undisputed that he was seen face-down in the water at least twenty minutes before he was retrieved from the pond. While a momentary one-time lapse of judgment by a parent ordinarily *1123 would not suffice to establish culpable negligence that is the legal cause of a child’s death, Ramos’s overall and ongoing pattern of gross indifference does. This lamentable pattern entitled the jury to find that Ramos was culpably negligent and caused Nathan’s death. Ramos’s conviction and sentence for aggravated manslaughter of a child is AFFIRMED.
WOLF and RAY, JJ., concur.

. Manslaughter is committed by act, by procurement, or by culpable negligence. § 782.07(a), Fla. Stat. (2012). To prove manslaughter by culpable negligence, the State must prove (1) the fact of the death and (2) a causative link between the death and the culpable negligence of the defendant. Jefferies v. State, 849 So.2d 401, 403 (Fla. 2d DCA 2003); § 782.07, Fla. Stat. (2009). Additionally, the death must not be the result of justifiable or excusable homicide. Id. Because this case involves aggravated manslaughter of a child, the State was additionally required to prove that (1) the deceased was under 18 and (2) defendant was a caregiver for him. § 782.07, Fla. Stat. (cross-referencing § 827.03(3)).

. See Fla. Std. Jury Instr. (Crim.) 7.7, Manslaughter (2012) (defining excusable homicide to include “[wjhen the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent”); but see § 827.03(a), Fla. Stat. (2012) ("Neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child.”). Florida's legislature has assigned heightened point levels for the crime of aggravated manslaughter of a child. § 921.0022, Fla. Stat. (2012) (classifying aggravated manslaughter of a child as a level 10 offense, higher than any other form of aggravated manslaughter).