NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ANGEL MEDINA, DOC #H45754,      )
                                )
            Appellant,          )
                                )
v.                              )      Case No. 2D15-654
                                )
STATE OF FLORIDA,               )
                                )
            Appellee.           )
                                )
_____     )

Opinion filed August 30, 2017.

Appeal from the Circuit Court for Polk
County; Catherine L. Combee, Judge.

David Maldonado of The Maldonado
Law Firm, P.A., Lakeland, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Wendy Buffington,
Assistant Attorney General, Tampa,
for Appellee.

WALLACE, Judge.

Angel Medina challenges his judgment and sentence for neglect of a child

causing great bodily harm in violation of section 827.03, Florida Statutes (2012),

following a jury trial. Because Mr. Medina's conduct in allowing a four-year-old child to

descend a flight of stairs unassisted—stairs that the child had regularly traversed

previously without significant incident—did not rise to the level of culpable negligence or a willful failure to care for the child's well-being, we reverse.

## I. THE FACTUAL AND PROCEDURAL BACKGROUND

### A. The Incident

On January 10, 2013, Mr. Medina was babysitting his girlfriend's four-year-old son, J.A., when J.A. fell down a set of unfinished wooden stairs inside of Mr. Medina's residence. The fall caused traumatic brain injuries and required a piece of J.A.'s skull to be removed in order to relieve pressure on the brain.[1] J.A. was in a medically induced coma in the pediatric intensive care unit for several days and had to stay at the hospital for over two months.

The incident in question began around 4:40 p.m. when J.A.'s mother left to go to work. Later that evening, J.A. was upstairs when he called down to Mr. Medina, who was on the first floor playing video games, and asked him if he could play video games with him. Upon Mr. Medina giving J.A. permission to come down and to bring his controller, J.A. began running down the stairs, where he subsequently fell, cracked his head open, was knocked unconscious, and stopped breathing. Mr. Medina then picked up J.A., ran upstairs, called 911, and tried performing CPR on J.A. until sheriff's deputies and paramedics arrived. The State later charged Mr. Medina with neglect of a child causing great bodily harm.[2]

---

[1]J.A. also suffered a lacerated liver. Although the State's medical expert testified that it was common to see such an injury with child abuse, it was not common, albeit possible, for the fall to have caused the laceration.

[2]The State also charged Mr. Medina with aggravated child abuse causing great bodily harm for a separate incident that allegedly occurred on May 13, 2013. However, the jury returned a not guilty verdict on this count. Accordingly, the following

### B. The Trial

At the trial, the State introduced Mr. Medina's personal statements made in a recorded interview with a detective. In the interview, the detective asked Mr. Medina if the child ever had any trouble with the stairs, and Mr. Medina stated that "[o]ne time there was [an] incident." When the detective later inquired about that prior incident, Mr. Medina stated, "It was—it was on the last step though. It was on the last stair. [J.A.] just—I don't know. I guess he tripped. He came—come down fast again. He just boom, boom, boom." It is not clear from this statement whether the references to "com[ing] down fast again" and "boom, boom, boom" referred to the January 10 incident for which Mr. Medina was on trial or to an earlier incident. The detective did not ask Mr. Medina any follow-up questions to clarify this ambiguity.

The State then introduced a reenactment video in which Mr. Medina had participated. In the video, Mr. Medina stated that J.A. was about halfway down the stairs when he fell. Mr. Medina further stated in the interview that he did not see J.A. fall but heard it. He asserted that he did not watch J.A. descend the stairs because he was sitting on the couch focusing on his video games. Also, Mr. Medina stated that J.A. frequently traversed the stairs and that he only knew of one other time when J.A. had trouble walking up and down the stairs by himself. Specifically, Mr. Medina stated that J.A. fell "going up" the stairs but that it was "nothing serious." Mr. Medina's report of J.A.'s fall "going up" the stairs seems to be the earlier incident that he referenced in the recorded interview.

---

discussion of the evidence presented at Mr. Medina's trial does not outline the facts regarding the May 13 incident.

A detective who was involved in the reenactment video then testified that the stairs were narrow, "very steep," and "progress[ed] upward pretty quickly." The steep stairs connected the first and second floors of the home, and J.A.'s bedroom was located on the second floor. There were about twelve steps in total and all of them were wooden with rough edges. The detective stated that the stairs were "still in the process of being refur[b]ished." There were two handrails to the right and to the left of the staircase, including balusters attached to the handrail on one side of the staircase. However, the handrail with balusters was not properly secured. Further, both handrails did not go all the way to the top of the staircase. Accordingly, there were no handrails for a person to hold at the very top of the stairs to prevent someone from falling off the step. The State introduced photographs of the stairs into evidence.

A Department of Children and Families investigator also interviewed Mr. Medina regarding J.A.'s incident. The DCF investigator testified that Mr. Medina told him that at the time of the incident, he had been playing video games and smoking marijuana. On cross-examination, the DCF investigator again stated that Mr. Medina had admitted to smoking marijuana on the day of the incident. However, the DCF investigator testified that it was "possible" that Mr. Medina had stated that he was smoking marijuana before the child was in the residence. The DCF investigator further clarified that it was not "one hundred percent true" to say that Mr. Medina had actually said, "I was smoking at the time of the incident."

In addition to the DCF investigator's testimony, the State and Mr. Medina introduced testimony from several law enforcement officers. Two of the responding officers testified that they did not remember smelling marijuana in the home when they

arrived.  However, a third officer testified that he smelled a "faint odor" of marijuana when he entered the residence, as if Mr. Medina had smoked marijuana a couple hours earlier.  Additionally, through one of the responding officer's testimony, the State was able to introduce and identify various objects evidencing drug use found in Mr. Medina's home, including baggies containing marijuana, marijuana shavings, a marijuana butt in an ashtray, a bong in the bedroom, a hookah, and three to four rolled up cigarillos on a child's table.  No one tested Mr. Medina to determine whether or not he had recently used any drugs or alcohol.

At the time of the trial, J.A. was six years old and in the first grade at school.  The State called J.A. as a witness at trial but did not first proffer his testimony outside the presence of the jury.  Thus, J.A. gave extensive testimony before the jury.  There were multiple problems with J.A.'s testimony and demeanor as a witness that we need not detail here.  Ultimately, the trial court called a halt to the testimony, and J.A. was excused.  After hearing the parties' arguments, the trial court ruled that J.A. was incompetent to testify.  Defense counsel moved for a mistrial.  The trial court never actually ruled on the mistrial motion but declared that it would give a curative instruction to the jury.  The prosecutor and defense counsel agreed on the text of a curative instruction that the trial court then read to the jury.  In the instruction, the trial court told the jurors that J.A. had been determined to be incompetent to testify and charged them to disregard entirely his testimony in their deliberations.

Next, the State introduced testimony from J.A.'s mother.  The mother testified that at the time she left, J.A. was upstairs doing a connect-the-dots worksheet.  She also testified that there was no marijuana or drug paraphernalia in the house when

- 5 -

she left and that Mr. Medina admitted to her that he smokes marijuana but he does not smoke marijuana at the house. The mother admitted that she sometimes felt it was unsafe for J.A. to walk up and down the stairs because J.A. was only four years old and "would get excited sometimes." The mother testified, "We'd always make sure he don't—don't run up and down the stairs." Then she said that J.A. would never run up and down the stairs. The mother testified that she never saw J.A. fall down the stairs, but she also said that she had seen him trip while running or playing soccer.

Finally, the State introduced testimony from J.A.'s father. The father testified that after the incident on January 10, 2013, he visited J.A. in the hospital. He testified that J.A. was alert but not awake. The father also stated that while at J.A.'s bedside, he heard J.A. say, "[Mr. Medina] was a mean man, [Mr. Medina] hit him, [Mr. Medina] cussed at him, [Mr. Medina] pushed him."[3] The father testified that when J.A. uttered these words, he would have to calm J.A. down by telling him that nobody was going to hurt him and that "[D]addy's here." Defense counsel objected to the father's testimony on the basis of hearsay, and the trial court overruled defense counsel's objection.

At the end of the State's case, Mr. Medina moved for a judgment of acquittal. Defense counsel argued that the State failed to meet its burden in showing that Mr. Medina willfully or by culpable negligence failed or omitted to provide J.A. with care or services necessary to maintain J.A.'s health. Specifically, defense counsel argued that the State failed to present evidence that Mr. Medina must have known or

---

[3]The State's theory of the case was that Mr. Medina had failed to supervise or to assist J.A. as he descended the stairs, not that he had pushed the child.

reasonably should have known that allowing J.A. to descend the stairs unassisted and unsupervised was likely to cause J.A. death or great bodily harm. In response, the State contended that Mr. Medina willfully failed to supervise J.A. by choosing to play video games and smoke marijuana, while leaving J.A. alone on the second floor and near a dangerous staircase. The trial court denied the motion.

Defense counsel then called the first responding officer, J.A.'s mother, and J.A.'s father. Mr. Medina elected not to testify in his own defense. The responding officer testified about the January 10 incident, as outlined above; J.A.'s mother testified about the May 13 incident; and J.A.'s father testified about his disciplinary methods with his children. The defense rested its case, and the jury subsequently returned a guilty verdict on count one but acquitted Mr. Medina on count two. This appeal ensued.

## II. DISCUSSION

### A. The Standard of Review

We review a trial court's denial on a motion for judgment of acquittal de novo, solely to determine if the State presented legally sufficient evidence to support the verdict. Durousseau v. State, 55 So. 3d 543, 556 (Fla. 2010). "Sufficiency is a test of adequacy. Sufficient evidence is 'such evidence, in character, weight, or amount, as will legally justify the [verdict].' " Tibbs v. State, 397 So. 2d 1120, 1123 (Fla. 1981) (citing Black's Law Dictionary 1285 (5th ed. 1979)). We will "not retry a case or reweigh conflicting evidence submitted to a jury." Id. Rather, we must determine "whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict." Id.

### B. The Applicable Florida Law

To convict a person of neglect of a child causing great bodily harm, the State must prove that the defendant "willfully or by culpable negligence neglect[ed] a child and in so doing cause[d] great bodily harm . . . to the child."  § 827.03(2)(b). "Neglect of a child" is defined as "[a] caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including, but not limited to . . . supervision . . . that a prudent person would consider essential for the well-being of the child."  § 827.03(1)(e)(1).  Indeed, "neglect of a child may be based on . . . a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child."  § 827.03(1)(e).

Additionally, "willfully" is defined as acting "voluntarily and consciously, not accidentally."  Arnold v. State, 755 So. 2d 796, 798 (Fla. 2d DCA 2000).  "[C]ulpable negligence [means] more than a failure to use ordinary care for others. . . . [I]t must be gross and flagrant [and] committed with an utter disregard for the safety of others." Poczatek v. State, 213 So. 3d 1065, 1072 (Fla. 2d DCA 2017) (first and last alterations in original) (quoting Burns v. State, 132 So. 3d 1238, 1240 (Fla. 1st DCA 2014)).  A caretaker's failure to supervise a young child does not always rise to the criminal level of culpable negligence.  See Ramos v. State, 89 So. 3d 1119, 1120 (Fla. 1st DCA 2012) ("Mere negligence in the care of one's young child doesn't necessarily amount to culpable negligence."); see, e.g., Kish v. State, 145 So. 3d 225, 228-29 (Fla 1st DCA 2014) (holding that, although unwise, leaving three sick and young children unsupervised at a trusted caregiver's home for a couple of hours did not rise to the level

of culpable negligence because the defendant "tried to provide for [the] children's safety" and the children were able to care for themselves); Bernard v. State, 769 So. 2d 1066, 1067-68 (Fla. 3d DCA 2000) (holding that leaving a seven-year-old child unsupervised in an apartment for over forty-five minutes did not "rise to the level of criminal child neglect"). "Culpable negligence must be determined upon the facts and the totality of the circumstances in each particular case." Ibeagwa v. State, 141 So. 3d 246, 247 (Fla. 1st DCA 2014) (citing Behn v. State, 621 So. 2d 534, 537 (Fla. 1st DCA 1993)).

### C. The Application of Florida Law to the Facts

It is relatively easy to summarize and state the foregoing general propositions regarding the criminal liability of the caretaker of a child. It is often much more difficult to apply such propositions to the facts of particular cases because close legal questions tend to arise in child neglect cases, where a caregiver's "degree of care, neglect, indifference, or callous disregard is measured against societal norms and expectations under the circumstances." Ramos, 89 So. 3d at 1120. After a careful consideration of the Florida case law and the evidence presented at the trial, we conclude that the State failed to present sufficient evidence to show that Mr. Medina was culpably negligent or willfully failed to care for J.A.'s well-being by allowing him to descend the staircase unassisted or unsupervised.

Here, although Mr. Medina chose to play video games and may have been smoking marijuana at the time that J.A. was descending the stairs, such action or inaction does not amount to a willful failure to provide for the well-being of J.A. Nor does it amount to culpable negligence, i.e., gross, flagrant, or an utter disregard for the

- 9 -

safety of others.  The mother's testimony and Mr. Medina's recorded statements reflected that J.A. regularly traversed the staircase without significant incident on numerous occasions.  In fact, the State introduced evidence of only a single prior incident where J.A. had experienced difficulty while ascending or descending these stairs.  And in that incident, J.A. apparently tripped on the last step without suffering any serious injury.  Indeed, the failure to supervise a child, including leaving children home alone for a few hours, does not always constitute culpable negligence or criminal neglect.  See, e.g., Kish, 145 So. 3d at 228-29 (leaving three children under the age of eleven at home alone); see also State v. Lanier, 979 So. 2d 365, 369 (Fla. 4th DCA 2008) (holding that the State did not establish a prima facie case for culpable negligence because the teacher was "actually keeping an eye" on a four-year-old child that she placed on a chair near the edge of the stairs, which the child later fell down); Burns, 132 So. 3d at 1242 (holding that upon seeing a child in respiratory distress, the defendant's call to the child's mother instead of the 911 emergency telephone service did not rise to the level of willful or culpable negligence).

We recognize that Mr. Medina's two statements regarding J.A.'s prior incident or incidents on the stairs are ambiguous.  Unfortunately, no one who interviewed Mr. Medina attempted to clarify whether there was more than one prior incident.  And without any evidence that J.A. had more than one prior incident with the stairs—an incident that apparently did not result in serious injury to the child—the State fell short of proving that Mr. Medina was culpably negligent.  See Ramos, 89 So. 3d at 1122 (recognizing that "[h]ad this been a single isolated incident—without the history of [the caretaker's] repeated indifference and inaction as to [the child's] safety—it might fall

- 10 -

short of a 'gross and flagrant' violation of a duty of care under a culpable negligence standard"). Because J.A.'s prior incident on the stairs was an isolated one, Mr. Medina could arguably have not deemed the stairs to pose such a risk of serious injury that J.A. required supervision or assistance every time that he traversed the stairs.

In sum, the State's evidence was simply insufficient under the Florida cases to support its theory that Mr. Medina was guilty of the criminal neglect of a child. Indeed, to hold otherwise would impose a significant risk of criminal liability on all parents or caretakers of small children who allow children in their care to use the stairs in their houses or apartments.

### D. A Case with Similar Facts

None of the cases cited by the parties directly addresses the issue of the criminal liability of a caretaker of a young child for allowing the child to ascend or to descend a flight of stairs without assistance. Independent research has revealed a decision of the Wyoming Supreme Court that addresses this issue: Dunsmore v. State, 153 P.3d 275 (Wyo. 2007). The facts in Dunsmore are similar to the facts in this case; the law of Wyoming on criminal liability for child neglect is similar to the law of Florida. For these reasons, Dunsmore warrants detailed consideration.

In Dunsmore, a caretaker left the basement door of a residence open, knowing that his two-year-old stepdaughter was going to descend the basement stairs, and failed to supervise the child as she descended those stairs unassisted. Id. at 276, 280. The child suffered a seizure while descending the stairs, fell down the stairs, and suffered serious injuries. Id. at 278-79. The jury found the caretaker guilty of child

- 11 -

abuse in violation of Wyoming Statutes section 6-2-503(b)(i) (2003). Dunsmore, 153 P.3d at 277.

Under section 6-2-503(b)(i), "a person is guilty of child abuse . . . if a person responsible for a child's welfare . . . intentionally or recklessly inflicts upon a child . . . [p]hysical injury . . . ." Wyoming defines "recklessly" as acting with a conscious disregard of a "substantial and unjustifiable risk" that harm will occur and that foreseeable harm results. Dunsmore, 153 P.3d at 280 (discussing "recklessly," as defined in Wyoming Statutes section 6-1-104(a)(ix) (2003)). Under the statute, a person only acts "recklessly" when his or her conduct creates a risk so great "that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Dunsmore, 153 P.3d at 280 (quoting § 6-1-104(a)(ix)). This definition excludes accidents. See id. at 281.

Similarly, Florida defines aggravated child neglect as a willful or culpably negligent failure to provide a child with supervision or care. § 827.03(1)(e)(1), (2)(b). "Willful" is defined as a conscious and voluntary act, not an accident. Arnold, 755 So. 2d at 798. Florida also defines "culpable negligence" as a gross, flagrant, and "utter disregard for safety of others." Poczatek, 213 So. 3d at 1072 (quoting Burns, 132 So. 3d at 1240). A decision by the Wyoming Supreme Court is obviously not binding authority in Florida. Nevertheless, the levels of culpability necessary to rise to the levels of criminal conduct under the Wyoming and Florida statutes are sufficiently similar that Dunsmore can provide guidance on the questions that we are called upon to resolve in Mr. Medina's case.

- 12 -

Moreover, the similarities between the facts in Dunsmore and the facts in Mr. Medina's case are noteworthy.  The issue in Dunsmore was "whether the [caretaker] recklessly inflicted physical injury upon [the child] when he left the basement door open and allowed [the child] to [go] down the stairs unsupervised."  153 P.3d at 280.  "The only evidence presented at trial that [was] remotely probative on the issue of whether descending the stairs unassisted posed a danger to [the child] indicated that she had successfully accomplished this feat before and, therefore, it would not be considered a dangerous situation by the [caretaker]."  Id.  The court held that the caretaker's failure to supervise the two-year-old child as the child descended the basement stairs unassisted "simply [did] not rise to the level of criminal recklessness envisioned by the child abuse statute," and instead "amount[ed] only to a tragic accident."  Id. at 281.  The court subsequently held that there was not sufficient evidence to support the jury's guilty verdict.  Id.

Like the evidence in Dunsmore, the evidence presented in this case showed that J.A. had successfully traversed the stairs unassisted many times before the incident at issue.  Further, J.A. was two years older than the child in Dunsmore, where the court held that failing to supervise the two-year-old child as the child descended familiar stairs did not constitute child abuse.  153 P.3d at 281; see also Kish, 145 So. 3d at 228 (stating "the children . . . weren't so young that leaving them alone in a familiar home for a couple hours could be considered" culpable negligence).  Although an officer testified that the stairs in the Medina residence were steep and unfinished, Mr. Medina's statements indicate that J.A. had only one prior incident with the stairs during the approximately two-and-a-half month period J.A. resided at the home, where J.A.'s

bedroom was located on the second floor. On these facts, the Wyoming Supreme Court's decision provides additional support for the conclusion that Mr. Medina was not culpably negligent in failing to supervise or assist J.A. during the incident when he descended the stairs to join in playing the video game. See Dunsmore, 153 P.3d at 280.

**E. The Authorities Relied Upon by the State**

In support of its contention that Mr. Medina's entire lack of supervision was criminally negligent, the State relies on State v. Sammons, 889 So. 2d 857 (Fla. 4th DCA 2004); Lanier, 979 So. 2d 365; State v. Wynne, 794 So. 2d 642 (Fla. 2d DCA 2001); and State v. Brooks, 17 So. 3d 1261 (Fla. 2d DCA 2009). In Lanier and Sammons, the Fourth District found that the State did not establish a prima facie case for culpable negligence because the caretakers did supervise the children by "keeping an eye on" them. Lanier, 979 So. 2d at 369-70; Sammons, 889 So. 2d at 859-60. Here, it is uncontested that Mr. Medina was not even "keeping an eye" on J.A., but as we already noted, a caretaker's failure to supervise a child does not always constitute culpable negligence. See, e.g., Kish, 145 So. 3d at 228 (leaving children home alone for a couple hours was not culpable negligence). Therefore, Lanier and Sammons are not instructive for this case, and the State's reliance on those cases is unwarranted.

The State's reliance on Wynne and Brooks is also misplaced. In Wynne, the State established a prima facie case of neglect by showing that the defendant "acted willfully or with culpable negligence in creating [a] dangerous situation" when he abandoned his six-year-old son on the side of a highway exit ramp. 794 So. 2d at 644. In Brooks, this court held that a mother's act of leaving her nine-month-old child

- 14 -

unattended in the bathtub with the water running from anywhere between fifteen to forty minutes was sufficient to show culpable negligence. 17 So. 3d at 1262. Unlike the facts in both Wynne and Brooks, where the caretaker placed the children in dangerous situations, J.A. was left unattended near a set of stairs that he had frequently and successfully traversed on previous occasions.

### F. The Impact of the Marijuana Evidence

Finally, the State argues that Mr. Medina failed to properly supervise J.A. because he was under the influence of marijuana at the time of the incident. Ideally, a sole caretaker of a child should be in the full possession of his or her faculties while caring for the child. However, a caretaker may be under the influence to a limited extent without the caretaker's conduct rising to the level of culpable negligence if the caretaker's slightly altered state does not negatively affect the caretaker's duty to supervise and care for the child, create a dangerous situation, or contribute to the child's injuries. See Sammons, 889 So. 2d at 858-59 (finding the evidence insufficient to support a conviction for criminal child neglect when a mother was drinking at a bar and left her child in a car with the windows down because she "[kept] an eye on her child rather than ignoring her"). Here, the State did not present any evidence that Mr. Medina's purported use of marijuana adversely affected his ability to supervise and care for J.A., created a dangerous situation, or contributed to J.A.'s injuries. And the fact remains that the child had successfully traversed the stairs many times before. We decline to adopt a per se rule that would impose criminal liability on a parent or caretaker of a small child for injuries occurring to the child after the use of alcohol or other substances by the parent or caretaker absent proof that use of alcohol or other

substances actually impaired the ability of the parent or caretaker to supervise and care for the child.

We recognize the possibility that a jury could find that the use of marijuana by a parent or the caretaker of a small child created a dangerous situation if evidence established that the marijuana smoke adversely affected the child. Cf. State v. Jensen, No. M2003-02848-CCA-R3CD, 2005 WL 1475311, at *5 (Tenn. Crim. App. June 21, 2005) (affirming the defendant's conviction for child neglect because there was evidence that the child's residence was filled with crack cocaine smoke and the smoke affected the child's health and welfare). However, the State did not present any evidence that marijuana smoke adversely affected J.A.'s ability to traverse the stairs, and thus created a dangerous situation requiring supervision and assistance.

### III. CONCLUSION

In closing, we are obliged to state that we neither approve nor condone Mr. Medina's conduct as described in this opinion. The stairs in his residence were steep and unfinished, and the hand railings were inadequate. The exercise of ordinary prudence would suggest that an excitable, four-year-old child should be assisted or—at the least—supervised while ascending or descending such a flight of stairs. Nevertheless, we are not persuaded that Mr. Medina's failure to supervise or to assist J.A. under the facts shown here rose to the level of willful or culpably negligent conduct. See Arnold, 755 So. 2d at 798 ("[T]he legal precedents have acknowledged that only the most egregious conduct, done either willfully or with criminal culpability, should be criminalized."). The only other reported appellate decision involving similar facts reached the same conclusion that we reach here. For all of the foregoing reasons, we

reverse Mr. Medina's judgment and sentence for neglect of a child causing great bodily harm and remand with directions to the trial court to enter a judgment of acquittal and to discharge Mr. Medina.

Reversed and remanded.

KHOUZAM and BADALAMENTI, JJ., Concur.