# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4357

_____

JUSTIN LEE LANIER,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Bay County.
Michael C. Overstreet, Judge.

February 28, 2019

ROWE, J.

Justin Lanier appeals his judgment and sentence for child neglect of his infant daughter. We affirm all issues raised on appeal and write only to address Lanier's argument that the trial court erred by denying his motion for judgment of acquittal.

Facts

For three weeks before she was finally taken to the emergency room on November 16, 2016, five-month-old L.L. had been screaming what her own mother described as "bloody murder." At the hospital, L.L. was inconsolable and in severe pain. She had bruises all over her body: on her head, behind her ear, down her back, and on her buttocks. She was unable to hold her head up on

her own. The only position in which the infant could find any comfort was lying on her stomach with her head turned to the side.

After a physical examination, doctors discovered L.L.'s skull was fractured in at least six places. On one side of the infant's head, a small piece of bone had broken off from the larger part of her skull. A nurse compared the x-ray of L.L.'s skull to a "broken egg." Blood and fluid filled the cavity between L.L.'s brain and her skull, causing her head to swell and appear visibly larger than normal. L.L. also had intraretinal hemorrhaging in her right eye.

Due to the severity of the infant's injuries, a Child Protective Investigator was called to the hospital. Upon entering the hospital room where L.L. was being treated, the investigator heard her making what he described as "the worst noise" he had ever heard. He testified that the sound was so distressing that he had to leave the room.

L.L.'s pediatrician suspected the infant had been physically abused. He reported that he had seen L.L. on October 24, twenty-three days before her admission to the emergency room. L.L.'s mother, April Zimmerman, had brought the infant into his office exhibiting symptoms of dehydration. The pediatrician and attending nurse attested that during that office visit, L.L. had no visible signs of injury, and no abnormal behavior was reported or observed.

When interviewed by the police, neither Lanier nor Zimmerman could explain L.L.'s injuries. Both parents reported that L.L. had fallen off their bed between two and half and three weeks before they brought her to the emergency room. Their estimated timeframe would have put L.L.'s alleged fall on or after October 26, two days after L.L.'s October 24 doctor's visit, and twenty-one days before she was admitted to the hospital on November 16.

Lanier was unemployed during the relevant time period and testified that he was responsible for taking care of L.L. while Zimmerman worked up to four overnight shifts per week. As the parent primarily responsible for L.L.'s care, Lanier bathed, fed, and changed L.L. But he testified that he never saw bruising on

2

the infant's head, above her ear, down her back, or on her buttocks. At the same time, Lanier admitted that he noticed L.L. could not support her head and keep it upright, and he described his infant daughter's neck as feeling "loose."

Lanier also admitted that he never sought medical attention for L.L.'s injuries. He claimed that he was under the impression that Zimmerman had taken L.L. to the doctor to be evaluated on November 7. He asserted Zimmerman returned home and reported back that L.L. was fine. Zimmerman admitted that she had lied to Lanier about taking L.L. to a follow up visit to the doctor on November 7. But between November 7 and November 16, Lanier knew that L.L. received no medical care. During those nine days, on November 11, L.L.'s grandmother observed that the infant's condition was not improving and urged Lanier and Zimmerman to take their daughter to the doctor. But both parents ignored the grandmother's pleas, and L.L. received no medical attention.

The next time a doctor saw L.L. on November 16, she had six skull fractures, a swollen head, a limp neck, and a bleeding brain. Three surgeries were required to drain the fluid and relieve the pressure from L.L.'s brain. A ventricular peritoneal shunt was placed inside the infant's head to help her reabsorb her spinal fluid. The neurosurgeon who performed the surgeries testified that there was a mixture of old and new blood in L.L.'s brain, which indicated the infant had suffered at least two independent injuries separated in time. This testimony was consistent with other testimony that L.L.'s injuries could not have been inflicted from a single fall or a single blow to the head. The neurosurgeon opined that the presence of new blood indicated L.L. was injured as recently as "a few days" before her hospital admittance. The presence of old blood was consistent with a separate injury inflicted up to "a few weeks" before. The radiologist confirmed that based on the density of the blood reflected on the infant's CT scan, some of the blood in L.L.'s brain was more than seven days old. The fluid and swelling caused L.L.'s head to grow to a size well above the ninety-ninth percentile for her weight and age. The neurosurgeon testified that it would have taken at least a few weeks for the swelling to have reached the point that it did. The

neurosurgeon opined that L.L. would have died without medical intervention.

Lanier and Zimmerman were charged with child neglect.[*] At Lanier's trial, Lanier and Zimmerman maintained that L.L. fell off the bed. Zimmerman's testimony revealed that from the time the infant allegedly fell from the bed until approximately three weeks later, L.L. laid in bed "getting worse and worse." Zimmerman admitted that the infant would scream "bloody murder" whenever either parent tried to move her.

At the close of the State's evidence, Lanier moved for a judgment of acquittal. He argued there was insufficient evidence to prove that his failure to seek medical attention for L.L. amounted to culpable negligence. The court denied the motion. Lanier was found guilty of child neglect and sentenced to fifteen years' imprisonment.

Analysis

We review a trial court's ruling on a motion for judgment of acquittal de novo. *Jones v. State*, 790 So. 2d 1194, 1197 (Fla. 1st DCA 2001). Viewing the evidence and all reasonable inferences in the light most favorable to the State, we must determine whether competent, substantial evidence supports the verdict. *Id.*

Lanier was charged with child neglect in violation of section 827.03(2)(b), Florida Statutes (2016). "Neglect of a child" is defined as:

> A caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including . . . medical services that a prudent person would consider essential for the well-being of the child; . . .

---

[*] Lanier was originally charged with aggravated child abuse and child neglect, but the State dropped the aggravated child abuse charge before trial.

4

. . . .

> Except as otherwise provided in this section, neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child.

§ 827.03(1)(e), Fla. Stat. (2016). Subsection (2)(b) provides that "[a] person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree."

"[C]ulpable negligence [means] more than a failure to use ordinary care. . . . [I]t must be gross and flagrant [and] committed with an utter disregard for the safety of others." *Burns v. State*, 132 So. 3d 1238, 1240 (Fla. 1st DCA 2014). It is "consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily harm." *Kish v. State*, 145 So. 3d 225, 228 (Fla. 1st DCA 2014) (quoting Fla. Std. Jury Instr. (Crim.) 16.6). We have explained that in child neglect cases, a caregiver's "degree of care, neglect, indifference, or callous disregard is measured against societal norms and expectations under the circumstances." *Ramos v. State*, 89 So. 3d 1119, 1120 (Fla. 1st DCA 2012). Therefore, the facts of each case are "critical" in determining whether the totality of circumstances supports a finding of culpable negligence. *Kish*, 145 So. 3d at 228 (citing *Ibeagwa v. State*, 141 So. 3d 246 (Fla. 1st DCA 2014)).

Lanier argues that while he may have been negligent in failing to seek medical attention for L.L. sooner, the State failed to demonstrate that his inaction amounted to culpable negligence. He contends there was no evidence he knew or should have known that L.L.'s skull was fractured, and that it was reasonable for him to rely on Zimmerman's assertions that she had taken L.L. to the doctor's office on November 7 and that the doctor found that L.L. was fine. We disagree. Based on the facts and circumstances of this case, there was sufficient evidence to establish a jury question

5

regarding whether Lanier was culpably negligent. *See Ramos*, 89 So. 3d at 1121.

The length of time between L.L. sustaining multiple injuries and her receiving medical attention was anywhere between seven days and three weeks. L.L.'s symptoms of trauma, her persistent and worsening condition, and need for immediate medical attention would have been obvious to any reasonable person. *See, e.g., Moore v. State*, 790 So. 2d 489, 492 (Fla. 5th DCA 2001) (affirming conviction for child neglect where father allowed infant to fall and then failed for two days to seek medical advice despite infant's noticeable symptoms and abnormal behavior). Several witnesses, including Lanier, testified that for at least three weeks before the infant was admitted to the emergency room, L.L. cried inconsolably when picked up and could not hold her head up on her own. Lanier stated that L.L.'s neck felt "loose." The evidence showed that L.L.'s head was visibly swollen and that her body was covered in bruises. L.L. was a five-month-old infant—she was not walking or even crawling. The medical testimony established that a five-month-old could not injure herself to such an extent.

Lanier counters that there was no evidence that he knew or should have known that L.L. had skull fractures. But a finding of culpable negligence in a child neglect case does not require proof that the defendant knew the specific nature of the child's injuries. Rather, it requires a showing that the defendant either knew or should have known that the extent of the child's injuries was such that the failure to seek medical attention amounted to a willful failure to provide for the child's well-being. *Compare Moore*, 790 So. 2d at 492 (finding sufficient evidence of culpable negligence where child suffered head injury in father's care and child's symptoms over the next few days were such that father should have known the injury required medical attention) *with Poczatek v. State*, 213 So. 3d 1065 (Fla. 2d DCA 2017) (finding insufficient evidence of culpable negligence despite caretaker's forty-five minute delay in seeking medical attention for child where child's injuries were not immediately symptomatic).

Here, there was direct and circumstantial evidence that Lanier knew or should have known the extent of L.L.'s injuries. Both Lanier and Zimmerman testified that Lanier voiced concern

6

about their infant daughter's condition and repeatedly asked Zimmerman if she had taken L.L. to the doctor. Even though Lanier was the parent primarily responsible for changing, feeding, and bathing the infant, he claimed he did not see any bruising on L.L.'s body. But the bruising covering infant's head, back, and buttocks was easily visible to the physicians in the emergency room and in the photographs from that day that were admitted into evidence and shown to the jury. Assuming Lanier did not notice the bruising, he admitted L.L.'s neck felt "loose" as far back as three weeks before she was finally taken to the emergency room. He knew for three weeks that L.L. could not hold her head up on her own, that she cried out in pain when she was picked up, and that the infant's condition was not improving. Still, he did nothing. Lanier's knowledge of the severity of L.L.'s injuries coupled with his failure to seek medical attention for the infant constituted sufficient evidence from which the jury could properly infer that his inaction was "knowing and intentional, or done with such wanton or careless indifference to [L.L.]'s well-being as to be practically intentional." *Arnold v. State*, 755 So. 2d 796, 799 (Fla. 2d DCA 2000).

Finally, despite the direct and circumstantial evidence that Lanier knew L.L. was severely injured and required medical attention, he argues it was reasonable for him to rely on Zimmerman's assertions that she took L.L. to the doctor's office on November 7 and reported back that L.L. was fine. But even if Lanier had relied on Zimmerman's false report that she had taken L.L. to the doctor's office, he took no action during the next nine days to alleviate his daughter's suffering despite urging from L.L.'s grandmother to take the infant to the hospital. The medical testimony established that the mixture of blood in L.L.'s brain indicated that she had been injured within "a few days" of her hospital admittance. When asked specifically about the infant's condition between November 7 and November 16, Lanier testified that L.L. was still crying more than usual and still unable to support her own head. He admitted that L.L. appeared to be in pain. He admitted that he noticed something was wrong with her. And he admitted that he could have found a way to take the infant to the hospital if he so desired. But he made no such effort. This inaction in the face of L.L.'s obvious pain and suffering clearly demonstrated "an entire want of care raising the presumption of

7

indifference to consequences" and was sufficient to support a finding that Lanier's failure to seek medical attention for his five-month-old daughter constituted culpable negligence. *Ramos*, 89 So. 3d at 1121. The trial court's denial of the motion for judgment of acquittal is AFFIRMED.

OSTERHAUS and KELSEY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Andy Thomas, Public Defender, and Kevin Steiger, Assistant Public Defender, Tallahassee, for Appellant.

Ashley B. Moody, Attorney General, and Amanda D. Stokes, Assistant Attorney General, Tallahassee, for Appellee.